Case number 25-5328, Medical Imaging & Technology Alliance and Advanced Medical Technology Association Appellant v. Library of Congress and Todd Blanche in his official capacity as Acting Librarian of Congress. Mr. Kimberly for his helm and Ms. Myra for the appearance. Good afternoon. Good afternoon, Your Honors. A stand-alone market exists for the works that are at issue on this litigation. It's the market for machine maintenance and repair. In the exemptions... You did not pop up in the way here. Okay. What is that?  Shall I proceed? One second. Do we need to adjust anything? I think we're good. There's no surprise judges for you. Okay. Sorry, I apologize.  A stand-alone market exists, Your Honors, I was explaining, for the works that are at issue in this case. It's the market for device maintenance and repair. In the exemptions and higher... Where did you argue to the librarian and demonstrate that there is a separate, distinct, as you said, stand-alone market for, I take it you mean stand-alone software as well? So the market is the market for service and repair. It includes the market for licensing the software that is used by both manufacturers and separate third-party servicers in the provision of those services. These are cases about the work itself, which is the software. Is there stand-alone repair software? Yes. Is it, in all or most cases, distinct and separately accessible software? Correct, yes. Where did you argue that to the librarian? So I would... Make a record on that. Sure. I would point the court, among other places, to JA 1361, which is... Can you hold it here with me so I can get the record? Okay. And, Your Honor, maybe even before JA 1361, which is where we made the record, I'd point the court to JA 1055. This is a declaration by Robert Wheeler, who is the founder and then CEO of Transstate, one of the principal proponents of the exemption at issue here. And at page, excuse me, paragraph 15 on 1055, he explains, in explaining the need for this exemption, that machine manufacturers, quote, compete with ISOs for the post-warranty servicing contracts to which the works are monetized. That's just work. That's not, when I say work, I was talking about the copyrighted work, not labor. This is just, there's labor to be done. Well, if... That's not... So there... Labor is distinct from a market for the copyrighted work itself. So two responses, Your Honor. One, respectfully, is a factual matter. I don't think that's correct. The way this software... It's a legal matter under the Copyright Act. Well, but the question is, how is this software marketed, right? How is it monetized? This doesn't say anything about that. This just says that manufacturers compete with non-manufacturers to service these things. Correct. Okay. Now... So what else do you have? So that doesn't make an argument that there is... I'm really most interested in, just so I can be clear for you, to be fair to you on this, but is any showing that there is freestanding software as opposed to the fact that they use this integrated software as part of the repair process? So there's freestanding repair software that is licensed, separately from the license, to have what we'll call the clinically operational software. So what I'm looking for is more of an answer to the copyrighted material. So, Your Honor, I think you can look at page 1361. Page 1361, a comment by Advamed. This is the fourth volume of JA. We're about two-thirds down. There is a market for some medical device software modules as standalone works. Some software on medical devices is activated and maintained through a subscription model. Some. So, again, where do you... Don't tell the librarian who's making a rule about access to operational software for purposes of repairs that there is...that this some is talking about that. This is just some. This is way too vague to put them on notice. And that's the same thing on the next page, 11362. There's another some software programs. Your Honor, it was...I would point the court also to 2JA631, where the librarian acknowledges that some system features are separately licensed through a subscription service. Yeah, but some doesn't say that... Your Honor, while you consider this, let me add, there was no dispute in the record. It was the proponents themselves who were crystal clear that what is at issue in this case is machine servicing software. This is software that is used to identify and resolve malfunctions. No, that's the portion of the software they wish to access, right? They need to go into...my understanding is that they need to go in and turn the machine on. You look at an error log. They need to be able to test the machine to run it operationally to see if they would fix something. And so you sort of have to look at what runs to figure out what's not running. But that's very different from what I understood, and this is what I thought was really stark in your briefing here. It wasn't until your reply brief that you seemed to come out full bore with, oh, there's this freestanding, separate, distinct software that is just for repair and maintenance. And it has a valuable market. It wasn't until your reply brief that I saw that in your briefing here. Otherwise, it was something about, well, there's a market for this work, that kind of service, this service, this repair service that's provided, and they access this operational software as part of their repair so that they can do repairs. No, no, Your Honor. Show me where you argued the librarian, the same thing you're arguing now. Because you even told him there's no distinct market. We said, I'm sorry, but we said there is a distinct market. Okay. That's 1361. 1361 for what? What does 1361 say the market's for? So for some software model. Your Honor, I mean, all this case has ever been about from day one when the petitions for this exemption were submitted was diagnostic and machine service software, software for that purpose. Where do you tell that it's freestanding as opposed to using the operational software as part of the repair process? Well, Your Honor, I'm not sure. Just as some modules. There's a market for some modules, right? And if I would have assumed that if there were, in fact, if there were just two entirely different categories of software in every one of these machines, slot A is the operational software. That's where that is. Slot B is where the repair software is. That's freestanding in your rights. Because that would have been said in those same direct terms that you. And respectfully, Your Honor, I think it was by the proponents themselves. They described the software issue here. And I'll come back to another point that there are also elements here that are not software. Can you tell me where you're from, first of all? I'm reading from page 1031. And these are, most of these are descriptions in sworn declarations by witnesses that Transtate itself put in the record. And they describe the works that are issued as, this is page 1024, diagnostic software and data files. Diagnostic software is not operating system software. Medical equipment servicing materials on 1031. This is, I'm sorry? I'm just trying to follow you on 1031 here. Medical equipment and servicing materials. So this includes, in addition, Your Honor, written works like service manuals, which provide instructions for servicers when they're confronted with a machine that's malfunctioning. I mean, this is a, you know, like a PDF file that has instructions on it. So I'm looking at page 7 and 8 in our reply brief. Sorry, I'm just on, sorry, sorry. The language on 1031 you're relying on is computer programs, and in particular, subset of electronic servicing materials for diagnosis, maintenance, repair of medical equipment. Exactly, yes. But the subset isn't a freestanding thing. Well, but Your Honor, freestanding is an economic concept, I think, with respect to what's going on here. There is a separate licensing market. To access those materials, you have to pay a separate license. That makes it a freestanding market. Your Honor, I would note that the Ninth Circuit back in 1995. Okay, maybe this will work better. Tell me where you talked about a freestanding market. I'm sorry? Where did you tell the library about a freestanding market? Your Honor, the, I'm sorry. I think there is a focus on this concept of freestanding market as sort of an idea independent of owing separate licensing fees, right? So the question whether there's a market is whether there is something of value for which the author of that work expects to be paid. And all throughout the record, all throughout the declarations that TransState submitted in Phillips' comments, in Azamed's comments, it's clear that there is a separate market for licensing these works. If there were not such a separate market, there wouldn't be a need for this exemption. Okay, I think that's a different point. Licensing them is, we'll unlock the key for you to get into our software and these medical devices, which is sold as a piece with the medical device. No. And I'm sorry, but that just isn't correct. These, this software is not sold with the device. That's the whole point. You know, it's like. The software isn't in the device? No, Your Honor. It's like purchasing a computer. Is that with PD? No, Your Honor. It is, to say that it is stored on the device is not to say that it is purchased with the  When you buy a computer, for example, the computer. It is stored on the device. It is stored on the device. When you buy a computer, Your Honor, it may come preloaded, for example, with antivirus software, right? Like McAfee antivirus software. The fact that the machine comes with that software doesn't mean you're buying the software with the machine. It comes on the machine. And then if you want to use the software, you have to pay a separate licensing fee. I don't, I've never understood there to be a debate in this litigation that that is how this all works. And I would know. So, 1372, which I think is. You know, or whatever, call it by blemishing text. Right near the top of third line. The fact that there is no independent market for the medical imaging device software beyond the devices themselves. And I'm sorry, where are you reading this? Your Honor? 1372. 1372. It's about three lines down from the top. I think this is Nita's comment. I'm not sure. Your Honor, I have not looked at this line before. And this obviously is not something that the librarian either before this court. So, you know, this is. But is that the repair software or the operating slash critical software? Yeah, I think that's likely what it's referring to. I think this is the operating software. Okay. Again, where did you tell them these are separated out softwares? Because I don't know, you can't repair something without using the operating software. I get that you are licensing it separately, but that it's a distinct package of software that could be accessed without also accessing the clinical. Your Honor, you know, I think when you refer to something, for example, as a diagnostic tool, which is the way that these were described. I have 1381, 1409, and 1422 all referring to diagnostic tools. I take that as sort of a common sense understanding that a diagnostic tool is not the same thing as operating software. And again, you know, it's sort of like saying. I have an error log as a diagnostic tool, but it's also part of the operating software, right? No, I don't think that's true. How can it operate independently of the software? It has to know what's going on in the operational software. Well, I think that's true of any software module that is created to repair a device. I mean, any software written to repair a device has to have the device and its operating system to be used meaningfully. That doesn't mean it isn't entitled to copyright protection. We know that the fact that you have this software and that you lock it up behind a key and then sell for access too doesn't create a market in the work itself. That was a left-mark case. This provides a separate service from the operation of the machine. If you want to run a diagnostic module that identifies and resolves malfunctions in the machine, and these are like, these could be physical malfunctions, so they identify, for example, part replacement needs. That is not the same thing as Windows or Linux, which is used to run the machine. It just is not the same thing, Your Honor. And, you know, I don't, again, don't understand this to have been a contested issue anywhere in the way that this case has been briefed to this point or before the library. I would point the Court, too, to page 1337 of Triad Systems. This is the Ninth Circuit's decision confronting analytically this exact scenario. In there, the Ninth Circuit responded to this argument. It says, the Southeastern contends that the District Court's analysis was flawed because Triad's copyright does not extend to the service market. We disagree. Triad invented, developed, and marketed its software to enable its own technicians to service Triad computers. Southeastern is getting a free ride when it uses that software to perform precisely the same service in competition with Triad. That is this case on all fours. So the thing that's very strange to me about this case is that the parties seem to be talking past each other. You've written a whole analysis assuming that the software at issue is the repair software, the software and, I guess, repair materials, manual software, et cetera, that goes to repairing the machine, whereas it seems to me that the librarian and the District Court wrote a whole analysis based on operations software, operations clinical software, things that you need to turn on the machine and have it run the way it's supposed to run. So I just feel like the two sides are talking past each other. And as I read this exemption, it applies to computer programs that are contained in and control the functioning of a lawfully acquired medical device or system and related data files. And to me, that exemption does not encompass repair software or repair materials because that is not software or materials that control the functioning of the device or system. And it's not related data files because it's not data. So my thought was I don't see why this exemption, which to me doesn't seem to include within scope repair software, stops you from going and enforcing your repair software copyrights or the anti-circumvention provisions for repair software. So I have two responses to that. The first is if this Court is inclined to resolve this case by interpreting the exemption as it was adopted to apply only to operating system software and is not extending to... Well, to be clear, I think there are three types of software. There's the operating system, like the Linux stuff. Then there's whatever software it is within the machine that makes it turn on and do what it's supposed to do. And then there's repair software. Right? There's really three types because I think the Linux stuff is a different... I think our concern, and I'm sorry to interrupt, Your Honor, but our concern here is the repair software and the repair documentation. Exactly. I don't see why you didn't just take the district court opinion and say that's a win for us. It doesn't include repair software. Why even involve this? Let's just go to court and keep enforcing our repair software rights. So that's the second part of the answer, Your Honor. And that's one, the district court did go on to say even if our interpretation is correct, nevertheless, ISO's use of repair software is still fair use. So the district court did reach that question. There was that additional reasoning she had about that too. And I would add that the march through the fair use analysis wouldn't be necessary if the librarian weren't also considering this as applying to Moore because if all that's at issue is the software necessary to activate and run the machine, you've got Section 117C, which already allows... I actually don't think that that applies, but it seems to me that there is a comment in the record that says in order to repair, you need to access the operating clinical software. And that seems to me to be the focus of this exemption and the librarian's analysis. But the way you framed the issue on appeal confused me because you're asking us to say the exemption doesn't mean what the librarian says it means and then asking us to knock down your interpretation of the exemption. But I think the issue is really that you're concerned about the repair software. The way I see it, the more straightforward argument for you is this exemption doesn't include the repair software and we just want clarification of that. And then that allows you to do what you need to do. The words of this exemption to me don't encompass repair software. Well, and so I don't want to look a gift course in the mouth, Your Honor. I think if you were to write an opinion saying that the exemption doesn't cover the software and other protected works that the proponents expressly sought permission to access and effectively the librarian failed to issue the exemption they asked for, we'd be happy with that. So I agree with you that in the applications for the exemption, they talk a lot about the repair materials and the repair software. But then the exemption that's actually issued says computer programs that are contained in and control the functioning of a lawfully acquired medical device or system and related data files. And that doesn't, the words of what they adopted to me doesn't seem to encompass the repair stuff. Well, like I said, we were looking at the two together and we understood the exemption as granting what the proponents had asked for. Again, if the court is inclined to say the proponents didn't actually get what they asked for. And to be clear, they asked for... I don't even understand how you can do a repair without then being able to turn the machine on. We're not... Write it and see if it works, which requires you to have access to what we call a clinical operational software. Your Honor, what we are objecting to is their circumvention of technological protective measures to access what is described at 1381 and 1422 as diagnostic tools. What is described elsewhere, for example, on 1409 as specialized service tools. And what is described elsewhere is as the documentation. Those are embedded in the thing. I'm really confused about the record in this case. Because you're now saying there's three distinct boxes of software in each machine. There's the operating system. There's then the operating software, the clinical software, like, say, an MRI run. And then there's a whole separate box called repair and maintenance. But MEDA, again, this is JA1552, said the 2021, that's the eighth round exemption, fails the Warhol test. The use of the copyrighted work, the medical device software, by third-party ISOs, they're using the medical device software, has exactly the same purpose and character as the original functionality of the medical device. The original work, the device software before repair, and the secondary use share the same exact purpose, to enable the device to function. Now, if the copyrighted work is exactly the same purpose and function as the copyrighted work that they're accessing, to enable the functionality of the medical device, that's just to me that they are not. Remember, they, that it's part of one set of software that necessarily includes, it necessarily includes, if the functioning part of the system has to talk to the malfunctioning part of the system, they have to have communications. They're not walled off in separate or medically sealed boxes. You can't repair and maintain something without having the error logs from the operational, clinical operational software. You have to be able to check and see what's not working in the clinical operation software. They, what the, what ISOs asked for was to get past the locks so that they could access the software for the purpose of maintenance and repair. Whatever part of the software is needed, an error log? How do, how is this, you know, what do the MRIs look like right now? Are they foggy? Are they clear? What is the problem? Let me see. I have to diagnose the problem by operating the machine. And then I will fix it. And then I have to test and see if it's fixed, that they really are grammatically sealed. So I just didn't see this argument to the district court. So I'm just really confused about how it seems to have evolved over the briefing. Your Honor, respectfully, this has been the argument that we've made all along, that it's distinct. So just, I'm going to try one more time in reference to the record. J.A. So I'm sorry, I think if you're saying distinct is in what you care about them accessing are the components of the software that are relevant to maintenance and repair. And that are licensed separately. Well, the license, licensing access to them. Right. Right. Right. But that's a different thing. You care about them getting into the clinical operational software because they're using it not to conduct an MRI, but to compete with your service programs and your service plans for these machines. Your Honor. So you don't want them getting in there and being able to do, to use this one box of software that has both clinical operational and repair and maintenance and diagnostic and tracking what's been done and not done on the machine and what's working and not working, which is one solid mass of software. You just don't want them in there for the purpose of maintenance. It is not a single solid mass of software, Your Honor. And I'll point you to page 1119 of the Joint Appendix. This is Volume 4, Paragraph 5. This, again, is yet another declaration. Sorry, what? Sorry, I'm not going to argue. Volume 4. 1119? 1119, yes. Okay, sorry. I was doing 1019. So I'm looking at Paragraph 5 on that page. The types of software and data files that. I'm sorry, sorry, which paragraph was that? Paragraph 5. The types of software and data files that OEMs restrict or limit access to through the use of TPMs, and that's what this is about, getting around TPMs. So the TPMs are blocking access to service logs, comprehensive diagnostic tests, error codes, remote diagnostics, Windows access, yes, and backup system settings, yes, but software updates for compatible hardware. This. Backup system settings. Comprehensive diagnostic tests. Remote diagnostics. I mean, this just proves that it is all one set of software. I mean, this is oversimplifying in my language here, that once you have walked away from people, there's access to the software sold for the purpose of TPM. So if I could perhaps get to a point, a part of that. Yes, I don't disagree. I don't disagree with that. My point is, it is, these are distinct software modules, right? These are not, this is not the software that operates. But they need, but there are, I mean, when you say operating system, you're talking about Windows. Windows or what Judge Pan has characterized as the clinical software. Okay, well, this definitely includes clinical things, right? Windows access, touch panel calibration, backup system settings, software updates, right? It does, Your Honor. The question about all of this, just to come back to the original point, is, like, is this fair use? And the question about all. It's likely to be fair use looked at overall en masse for the next five years. Yeah, I mean, likely is sort of a judicial gloss. That doesn't appear in the statute itself. The statute says, are they likely to be inhibited in their ability to make non-infringing use? Not likely non-infringing. Sorry? Not likely non-infringing use. I mean, it's, I think, let's just say there's a question of statutory interpretation about what the likely modifies as we go down that statute. Okay, suffice to say, Your Honor, the question, I'm not sure that fundamentally, the analysis changes. The question here is, are ISOs putting what is undeniably copyrighted works to their intended use? And if it is an intended use to facilitate maintenance repair, it's an intended use. And it cannot be transformative to put those sorts of diagnostic modules to use to their precise intended purpose. Okay, but so that's, this is, so this argument, this is what I feel like is where librarian was, is that we have our software in these machines. Pieces of it are particularly for software maintenance, or sorry, excuse me, repair, maintenance, error logs sort of crosscut both areas. So it could be the operator's error as opposed to something wrong with machine error. So error logs, both things. And so the question is, and the original owners, the holders of the copyrights to the software, have precluded access to that software unless someone buys a license for purposes of repair and maintenance. That's fine. That's the argument I haven't understood all along. So it's the purpose with which someone comes in to repair and maintain. Right. And so I think, you know, the distinction between the two kinds of software ultimately comes back to the question whether this was an original intended use of the software. And whether or not you think that it is marketed separately or not, obviously the use is an original intended use. Obviously, too, there is a market for both the service and repair work through which these separate works are monetized and through licensing. So before you get there, I just think that the critical issue in this case is defining what does the exemption cover and what type of software or computer program we're talking about here. And in terms of the record citation, the part that caught my eye is at JA 120 to 121, where this is one of the applications for the exemption, TransState. So it says, the alleged TPMs prevent or hinder medical equipment owners and lessees and their lawful agents from repairing, diagnosing, and maintaining the medical systems and devices that they own by restricting or denying access to, and this is the key part, electronic service materials installed in the medical equipment or otherwise provided via electronic media. So that's the electronic service materials. That's the software that's aimed at actual repair.  And then if you skip down, it says, further, to perform the servicing activities, it is necessary to activate the computing processors and to execute software to operate the various components of the medical equipment. So to me, that's a different bucket of software. Further, you also have to activate the computing processors and to execute software to operate the various components. So in my mind, we have at least two buckets, the electronic service materials and the operating or clinical software. And it seemed to me that the exemption that was actually adopted focused on the operating clinical software, both in terms of the analysis and its reasoning, it focused on the operating clinical software. And I think depending on which type of software you're looking at, the whole fair use analysis just falls into line. Because if you're looking at operating use software, repair is transformative, repair. And repair doesn't interrupt the market for the operating clinical software. And the exemption is fine. But if you define the software we're talking about as the repair software, then the fair use factors favor your clients, which is remade repair software. You're using it for repair. That's not transformative. You are interrupting our market for repair, which is what we're doing. So I just think the key issue in this case is to define what is the scope of this exemption? What is it talking about? And I look at the plain language of the exemption, and it does not talk about repair software. It's not repair software doesn't fall within exactly what it says, which is computer programs that are for the functioning of the whatever the language was, the functioning of the software or the device. And I don't think data files can cover repair manuals or repair software either. And I don't see the ISO manufacturers or people here as an intervener. It seems that you both win. We uphold the exemption, and it doesn't include repair software. And I think that that's the best reading of this exemption. And I would say, Your Honor, I think we've been operating from the perspective that the library granted the proponents the exemption that they asked for. I don't want to argue against myself, though. So if you are inclined to approach the case in that way. I'm inclined of all to read the exemption that way, if it could be read that way. But let's just read it. Computer programs that are contained in and control, is JA-652, because the H-1 was just carried forward in the night. Computer programs that are contained in and control the functioning of a lawfully required medical device or system. That includes both the repair stuff and the clinical operational stuff. How does the repair stuff? And then related data files. When circumvention is a necessary step to allow the diagnosis, maintenance, or repair of such a device or system. Okay? Now, yes, and I will tell you- You have read that from day one, both in the 8th and the 9th, and you've protested vehemently to the librarian that you're opposed to it. With the full understanding of everybody, that this includes, when it says computer programs, it's all of them that are in the device. Right? Contained in and control, repair things, control, how you repair it controls the operation or the functioning operation of a lawfully required medical device or system. It's all those computer programs. I guess you could have brought a challenge that says we aren't sure what this covers. It's too vague to understand. You could have said we're going to read it as not doing exactly what the librarian thought she was doing and what was asked for and what we vehemently protested against for pages and pages and pages and brought a fair use challenge, right? This is just a protection against infringement, right? Of determination as to infringement. But you still can challenge something as a fair use in a particular place, right? If she's making sort of a global likelihood assessment, you could have gone after them and made this argument, and that would be the place to sort that out. But the district court, I mean, you and other medical device manufacturers throughout the eighth and the ninth rulemaking procedures were quite, I'm going to use the wrong word, exercise. I don't mean that in a negative way. It's like vehement in your opposition to it. Because you read computer programs that are contained in and control the functioning of a required medical device or system includes those components of the computer programs that assist with maintenance and repair and diagnostics. Well, and I will tell you, regardless how we were interpreting it, that's how the, you know, 10,000 plus ISOs are interpreted. That's why you're here, because that's how you've interpreted it. Well, it's how we've... That's why you went to district court and that's why you're here, because you've interpreted it as allowing the very access. As I answered to Judge Pan, we have understood the exemption to be a grant of the exemption that the proponents requested. And the proponents were very clear that that, that they wanted access to... Well, I'm thinking that maybe you've thought about this more than just, well, that's what they argued for. Because people who are on opposite sides of litigation don't always just say, well, if you argued for it, you must have gotten it. I mean, that's what this language encompasses. You guys are the copyright holder. That's how you've read it, as allowing what you consider an appropriate infringement of your copyright, right? Are you of the view that the Eighth and Ninth rulemakings unlawfully allow infringement of your copyright in the computer software in these devices? Yes, Your Honor. I think if you read the explanation... All it allows is access necessary for repair. You still read that as... This is your position here, right? That that unlawfully, when it allows access only as necessary for repair and maintenance, it is infringing your copyrights in the computer programs that are embedded in your medical... Our position has been... Our position, Your Honor, has been that when it allows access to separate diagnostic and maintenance-related service tools and... I'm sorry. ...written words... That access to your computer programs that are embedded in your medical devices in which you hold a copyright? Your Honor, I'm not sure what embedded means. I will agree they're stored on. Embedded is not a concept really that I understand. Okay. I will use this one, that are contained in. Yes. Is there a difference between embedded and contained in? Embedded to me sounds like inextricable. I mean, these things can be uninstalled, right? I mean, it is a software program. That's my... It is storage. All right. So contained in, right? So, I mean, your copyright is in the software that is contained in your medical devices, your clients, to be clear, right? Yes. Right. And you don't want access to that. You've opposed it when your protections, your keys, are allowed to be circumvented as a necessary step for diagnosis, maintenance, or repair. Yes. That's what this thing authorizes, and you say that is what's unlawful. Because they allow circumvention of your copyright protections for diagnosis, maintenance, or repair. Yes. I think you've been consistent about that. But here again, your Honor, I'm not going to argue against myself and Judge Pan's view that maybe the librarian did not succeed in giving the proponents the exemption.  The breadth. Well, twice. I mean, it just agreed to upload it again the second time. I'm unclear why were you coming back to oppose the Ninth's rulemaking if you're perfectly content with the Eighth? Well, but again, your Honor, I mean, lawsuits like this are broad-based in practical reality and not just abstractions about how to read these things. ISOs have interpreted this exemption as permitting them to circumvent keys. You could say we don't, and we're going to bring a fair use suit against any—or an infringement suit against any individual that does so. Yeah, although circumvention—no, because circumvention of a technological protective measure is a different issue from infringement. But you bring enforcement actions for this measure, though. I'm sorry, I don't follow. You do bring—it's all over the record that you—OEMs aggressively bring enforcement actions, lawsuits for circumventing your TPMs. Yes, there's a lawsuit in the record that concerns pre-exemption efforts by TransState to circumvent the technological protective measures at issue here. Judge Malauulu is saying you can continue to do that and just say that this exemption doesn't cover the record. Yes, I mean, that is an option. That doesn't mean that bringing an APA suit against the exemption is not also a valid option. I'm just back to saying I'm not sure, you know, what language in here doesn't cover the components of your computer programs. So, Your Honor, that sounds like a disagreement maybe with the way Judge Pan is conceptualizing the case, but that just puts the highlight on our fair use argument. But I guess there's no dispute that—well, if it's a computer program, which it is, you're not handing out paper manuals, repair manuals, right? No, we—no, actually, we are. I mean, part of what's going on here— Those aren't covered by this. No, they are, right? I mean, that's related data files, so that would be like PDFs of repair manuals for—with instructions on how to diagnose and repair the machine. That is like a classic written work. I didn't know you guys still did classic written work. Well, there you go. I mean, it's there, and that's covered. We think that certainly ISOs are reading it as being covered by the data files. Under the types of keys that are regulated by the— Well, I mean, it's a book. If you want—yes, I mean, it's behind technological protective measures, just like an MP3 is covered by the— Oh, so it's still a computer file. Your PDF—I'm sorry, it's printed out PDF. Correct, correct. No, no, I'm sorry. Yes, no, it's a PDF. I'm old enough to remember paper manuals. Yes. Yes, so it's part of a—yes. Yes, but it isn't like a software file, right? It is a written work that you read on a screen or you can print out, if you like, but it's still a written work. Access to a computer program. Do you have to get into the—I think you have to get into the computer programs on this device to see this. I think it's just a stored file on the device, Your Honor. On the device, right. I mean, so you need to activate the device. In this case, it's not about the copying necessary for activation. We concede that's covered by 117C. So that's not what this case is about. This case has never been about what's necessary to turn the machine on. If the exemption was intended to cover all computer programs within the device, it would just say computer programs contained in the device, but it says contained in and control the functioning of the device. And to control the functioning sounds to me the plain meaning of that is the operation clinical software. Like, you don't need repair software to control the functioning of a device. Yeah, you do. Yeah. I mean, I think ISOs disagree, Your Honor. I would be— Do you disagree? Can you explain how it works? How does it repair? That hasn't been—just candidly, it hasn't been a litigated issue in this case. So that is not something I'm prepared to explain, Your Honor. I will— You haven't argued that—you haven't argued that it's not included. Well, it's a question about the interpretation of the exemption, and this is an APA case challenging— You have consistently interpreted it to— It consists—yes. —to cover— Yes, we have—we are challenging it consistent with the way in which the proponents requested it. That's correct. We have taken as given that the grant— Are you aware of any medical device manufacturer that has interpreted the 8th or the 9th exempting differently? I am not— Is that something? I'm not privy to how my client's members have interpreted the exemption. And I just want to jump in here for a little bit. Just a couple of things. With respect to the 10th Triennial rulemaking, what, if at all, effect do you anticipate from that rulemaking with respect to this case? Well, Your Honor, that rulemaking hasn't commenced yet. It's going to commence, I anticipate, next month. I imagine and certainly we are expecting that ISOs will seek a renewal of the exemption. If it is not renewed, it will expire on its own terms at the end of the three-year period from the 9th. So we expect them to renew it, and we expect to make the same arguments that we've been making all along in this litigation. What is the date of expiration? It's October 2024, so October 2027. It will cease.  And are you all planning to oppose the extension or renewal? Is it post-renewal? Yes. I expect we will oppose it on the same grounds that we have, that these uses are not fair uses. They're substituted commercial uses that by no means constitute fair use. And that obviously is where the thrust of this litigation until now has focused. Why do you put your repair materials on the device? Because if you really want to maintain control over them, you don't have to put them on the device, do you? Or your clients don't? Yeah, I suppose they don't. You know, I think it's the same reason that you might put, you know, preload antivirus software on a computer. It's more likely that the end user will end up paying for a license to use that software if it's already there and readily accessible. There may be other conveniences. There may be other security reasons to do it. I don't know for certain, Your Honor, but I think the premise of your question, could these devices be delivered without the software? I understand the answer to that question to be yes. And I just want to be clear. When you're talking about the functionality of the medical device, what is the distinction between those programs or files versus what you perceive are required to diagnose, perform the maintenance, or repair the medical device? Or are those overlapping? And I'm sorry, Your Honor, those are overlapping with what? What was the first category? Well, the functionality. Functionality versus diagnosing, performing maintenance, or repairing. Right. So we understand the functional software, the operating software, to be the operating system, which as we've explained is typically Linux or Windows, plus what Judge Pan has described as sort of the clinical operating software that runs the machine itself. That's distinct from the diagnostic tools, which, for example, will run diagnostics on the hardware itself and identify faults with hardware, maybe identify hardware that needs to be replaced and that isn't working properly. It might also indicate where software faults are happening. And it also includes things like error logs, which record historically where faults have  And all of that— I'm sorry, are error logs part of the clinical operating system or solely for— I don't understand things like error logs to be necessary for a machine like this to  So that was certainly the way that we have conceptualized it, that it is distinct from the operating system software. And then for the Warhol case, do you see there being a distinction in that case between repairing the device and operating the device? I don't, Your Honor, and I think Warhol is really clear about just how substantial a difference it must be to qualify as a transformative use. And, you know, Warhol is, I think, especially helpful because it frames it in terms of the first principles of copyright law, which is about protecting the authors of creative works from copyists who want to put copies of those works to use in a substituted commercial way. If a use and purpose of a copy is so different that it isn't substitutive, which might be the case, for example, with a parody or criticism, then it's likely to be transformative. But that obviously does not describe what's going on here. So— But it also seems that you don't have a lot of evidentiary support in the firm of declarations from technical programming experts or market experts with respect to all of these technical distinctions. Was there a reason for that? I guess there are two answers to that. The first, Your Honor, is the evidentiary burden is on the proponents of the exemption. It's not on opponents of the exemption. And we—and respectfully, Judge Millett, I understand you may see it differently, but I think we were clear in our comments, and I think the declarations in support of the proponents were clear that these were competitive services that were using the software for the same basic reason. And so it was not on us to explain why it's not transformative. It was on the proponents to explain why it is. And they certainly didn't carry that burden. They seem to have acknowledged that there is a commercial substitutive effect here. And really, that was billed as the purpose of this exemption. And you mentioned the Triad Systems case, but that came out before the Digital Millennium Copyright Act. So tell me about what you perceive as the relevance. Yeah, well, I mean, this is about fair use. And fair use obviously predates the Digital Millennium Copyright Act. The DMCA didn't alter the fair use analysis. Triad Systems came out one year after Campbell. And the librarian herself at the time, at page 600—excuse me, not there. Sorry, I don't—I think it's 868 of the joint appendix, says that between Campbell and Warhol, there was no meaningful, relevant change in copyright law, in fair use law. And that all Warhol and Google did was confirm the same basic analytical framework that Campbell applied. Well, Triad Systems applies the Campbell framework. It came out one year after Campbell. And it checks all of the same analytical boxes that the court's contemporary fair use analysis does. So I think to hold here that this is not—that this is a fair use to put these works to use in the service and maintenance market competitively with the authors of the works would create a square circuit split with a knife. Well, I think the argument to distinguish Triad Systems is that we're talking here about the operating system clinical software and whether that's being transformed for use in repair. Triad is straight on about repair software. Well, I will acknowledge, Your Honor, the caveat of my observation is that we're talking about the diagnostic tools and other service-related materials that the proponents sought the exemption to cover. Again, if they failed in actually getting an exemption to cover those materials, we'll take that as a win. I mean, the reason I have trouble with that analysis is the whole fair use analysis doesn't address repair software. It addresses the operating clinical software. That's why they're saying it's transformative. It's transformative to use operating clinical software for repair services. That's not what the operating clinical software was for. And using operating clinical software for repair services doesn't impinge on the market for operating clinical software. But the analysis you posited is different because you are assuming that it's the repair software. It's very confusing because you're arguing counterfactually to what it seemed to me the exemption was holding and what the reason for upholding the exemption is. It focuses on the clinical operating software. So, and Your Honor, if you were to write an opinion to that effect, I think it would be a very important direction to the market. It is not consistent with the way the market is working right now. ISOs are relying on the exemption for the sorts of diagnostic software and tools and other service-related materials that are discussed in the administrative record. And so I think it would be very, very helpful for all of us for the court to state expressly and plainly that the exemption, in fact, does not cover those materials. And as I say, if the court were to take that approach, I think we would be happy with that outcome. And, Art, is this about essentially intentionally leaving ISOs out in terms of being able to repair any of these devices? No, ISOs are free to purchase licenses on their own. Of course, they won't be able to provide services at 50 percent less if they do. That's the whole point. They can also develop their own diagnostic software and repair manuals. The fact is they don't want to do that because they don't want to be subject to FDA regulation. They don't want to take on the cost of research and development necessarily to do it. And they don't want to pay a license. They just want a free ride. So they have options, but those options don't allow them to undercut the authors of the works 50 percent off. So they're not going to do it. When Timmy has a repair person who shows up, so with this exemption, let's assume the exemption is letting them come in to access the computer programs so that they can do repair, is there, which are otherwise under some sort of digital lock. So does this exemption mean you unlock, that you give people, how physically does this happen? Yeah, so there are different tools for circumventing these measures. One is called brute force. They potentially cause damage to the code when they do it, but suffice to say they break through the encryption, the password encryption. And once they do, the system is open to them. It's open to them, I would say, by the way, in ways that would be inconsistent with training safety requirements. Have you separately encrypted these things that you call the subcomponent or subset of  Is it separately encrypted or is it just an encryption for the software? I understand it to be separately encrypted, and it may be that there are two different steps of decryption necessary. I will say that's not in the record. So do they first have to get into the programs? And sometimes the way they do it is they'll get a license key from the owner. The owner of the machine will have a license to operate the machine. They've got a license key to do so. They're, you know, our position is they're violating the license to share the license key with an unauthorized third party. But sometimes the ISO will just get the owner's license to open the machine. Sometimes they'll use brute force. Sometimes there are different layers of encryption, and they'll have to use brute force for sort of secondary layers with respect to other parts of the machine. But all of this... That is not in the record. Oh, I'm sorry, I don't want to misspeak. The tools that they use, like the brute force and the damage that it may potentially cause both to the security and the sort of integrity of the machine, that is in the record. How, you know, whether the repair tools are subject to their own separate encryption is a separate issue. That I do not understand being the reason. So I have a methodological question. If we view all of the software at issue or computer programs at issue to be one mass of computer programs, and it's a mix of repair materials and operating clinical stuff, how do we do the fair use analysis if it's a mix of the two? Well, fair use turns on use. So the question is, what are they using and for what purpose? Our argument about fair use does not concern the use of the operating system and what you have characterized as the clinical operating software to operate, to, you know, to turn on and operate the machine. So if the exemption is meant to cover all of the programs, a mixture of the two, you can just challenge the use of a section of it.  A subsection of it. Right. You are just challenging the use of the research, I mean, the repair materials. That's right, Your Honor. And again, I would point the court, and I'm sorry, I've got it buried now, to the Ninth Circuit's analysis and triad systems at page 1337, where it describes how the way that these works are monetized, the way that they are marketed, is in the market for maintenance and repair services. And so they are separately licensed. They are—the access to these works is sold separately from the machine itself. And typically, the way they're monetized is you hire a manufacturer's own servicer who comes with access to these works, or you can buy a license. But I guess my question is just—I'm just thinking through, like, how we would analyze this, where it seems that if you do the fair use factors and think about repair software, it's one analysis. And if you do the fair use factors and you think about operating factors, it's kind of a different answer. And we're looking at one exemption, and whether it's arbitrary or capricious or not, or whether it should be upheld or not, and they're mixed together. So I don't know how to handle the fact that these things are mixed together and you get different answers depending on which one you focus on. Do you focus on the most prevalent kind of software that's—or computer programs that's subject to the exemption? Your Honor— Or if any use of the exemption can inhibit users and failures, then it's okay. Because the operation clinical stuff, I think— I think it's the other way around. I'm infringing. No, I think it's the other way around. So this is an APA case, so the remedy that we're seeking is in order of setting aside the exemption. I don't—you know, I'm thinking about maybe, like, an as-applied injunction that limits the application of the—we haven't asked for that. You haven't set aside the whole thing, but it might be perfectly fine with respect to uses of clinical operations. Well, but 1201A1C requires the librarian to make a determination, quote, of whether persons will be adversely affected by the prohibition under subparagraph A in their ability to make non-infringing uses under this title of a particular class of copyrighted works. So the non-infringing uses has to be tied to the class of copyrighted works to which access is permitted by the exemption. If the exemption is giving access to a class of copyrighted works as to which use would be infringing, then it is a violation of— What if it's a mix, though? If the class of works is all of the computer programs, both repair and clinical operating, then it would adversely affect some of the non-infringing stuff, which is— Well, it's just— Operating clinical stuff. Right. It's just to say I think the library has to tailor the exemption to the non-infringing uses that it determines may take place. It can't write an overbroad exemption that unnecessarily sweeps in— But that's not the argument you made, right? No, it's— I haven't heard enough of here. No, right. I mean, look, our position is that the exemption authorizes ISOs to circumvent technological protective measures with respect to infringing uses of a class of copyrighted works covered by the exemption. If an exemption covers a class of copyrighted works as to which there are not non-infringing uses, then it is an arbitrary and capricious exemption. Wait a minute. If you are agreeing that the exemption is fine as to what we'll call— Operating and clinical. Operating clinical software, then it was on you to say we're only—we want a tailored—you've asked for a picture of the entire exemption, not for a tailored injunction. That's exactly right, Your Honor. And to be clear, we have not conceded that it's okay. We have focused— So you also dispute access to the operational—sorry, clinical— No, Your Honor, we just haven't brought that challenge. Our challenge— I mean, if either you take it—if you haven't challenged it, you're out of time to challenge it, then you're accepting it as valid. We are challenging the exemption on the basis that it grants the right to circumvent technological protective measures with respect to manifestly infringing uses. But if there are also non-infringing uses, it seems that it would fall within this provision because there are also—it is inhibiting ISOs for making non-infringing uses of the operational clinical software. Well, I think there are two answers to that, though. The first, again, and I understand, Judge Payne, you see this differently, but I think 117C solves that problem. But set that aside, Your Honor. The—you know, it's like, how do you define the particular class of copyrighted works? The library can't circumvent this limitation on granting access only for non-infringing uses by writing unnecessarily overbroad descriptions of the class so that it captures both infringing and non-infringing. We are challenging the application of this—we are challenging the grant of a right to circumvent with respect to a particular class of copyrighted works as to which all uses are—we take the position are infringing because they are not fair use. Including clinical operation. Operational clinical. Operational clinical software. Well, again, we haven't made that argument, Your Honor. No, I understand. I'm speaking to vacate the entire exemption. Well, right. And so the— We don't get to. No, of course we do. No, the proponents are free to come back and ask for that narrower exemption if that's what they want. No, no, no, no, no, no, no, no, no, no. We're talking now about relief you sought from a district court, not from the librarian. Well, and I was talking about what the ISO is— Appealing the decision of the district court. Right. You ever ask the district court to issue this narrow injunction? That's correct. You want the entire exemption thrown out. So is your answer—is that because you consider access to operational clinical software also infringing? No, it is—we have not made that argument, Your Honor. I understand you haven't made that argument, but to the extent that this exemption covers both categories, then that's worse for you. Because if you acknowledge that it covers both operational clinical software and repair software, as you must, and that's what you even told the district court in your briefing there, that you have to use both for the repair process, but then you didn't ask for relief that was tailored to— Well, it's because the APA— Not the operational clinical— The APA says set aside. But let me say, I think it would be a strange— I think it's set aside in part or in whole. That's not an argument. Courts do it all the time. Set forth and settle aside. We do it all the time. We do it a lot. I will tell you, Your Honor, it would be an unusual interpretation, I think, of 1201A1C to say that the librarian is free to lawfully adopt exemptions that are overbroad, that cover both infringing uses and— No, Your Honor, I mean, when you're—look, agencies do things, and if nobody challenges them, whether they are overbroad or not or unreasoned, it's of no interest to this court. Someone brings a challenge, and that challenger has a burden of proof, both as to the arguments they're making, the record they're creating, and the relief that is sought. And your relief that was sought was to get the whole exemption gone, even though I think you agreed that the exemption covers use of operational clinical software also as part of the repair and maintenance process. So you overshot. Yeah. Look, our argument is that the exemption is arbitrary and capricious as, again, Judge Pan, taking as given that the library succeeded in granting the exemption that the ISO sought, which was an exemption for diagnostic software and related service materials. And indeed, if it is—if copying those materials and putting them to their intended uses in commercial competition with manufacturers is not fair use, then the exemption is, in fact, arbitrary and capricious. One more question? Hey, Shiles, do you have any questions? All right. We kept you up a little bit over time. I believe this will give you some time for rebuttal. Thank you. Good afternoon. May it please the Court, Laura Myron for the Library. I'd like to start with a basic point of copyright law that I think might help with some of the confusion about the sort of repair software mixed fair use question. And I think the point that's really important that is missed a little bit in this case is that access itself is not copyright infringement. That in order—and this Court sort of elaborated on the distinction between access to things that are behind technological protection measures and copyright uses that are infringing copyright in green. When it said you can access something and that's different, that might be, you know, give rights of liability under 1201, but it's not copyright infringement. In order for there to be copyright infringement, there must be copies that are made, and those—what we're looking for is the use of those copies, not the use of the software when the technician is employing it. So the repair software to the extent that the Court conceives of it as such, as opposed to diagnostic tools that are embedded in the suite of software that is being sold as part of this machine, isn't itself repairing the MRI machine or the ventilator or whatever the medical equipment is that the technician is using. And the repair technician is not retaining copies of that software, not selling it to the next client who is looking to have their machines repaired, not putting it into or developing their own MRI machines. And so, you know, it is very reasonable for the librarian to conclude that those copies that are incidentally created as part of that repair technician's access to the software are non-infringing use of those original works. And that is underscored by the fact that there is, of course, no standalone market for the original work, and as the Supreme Court highlighted in Google— because if you define the original work as repair software, there apparently is some kind of a market for that, like a licensing market. No, I don't think that is right, because the question isn't whether there is a market for—you know, there is a secondary market for repair technicians who might come and use the software. The question—and this is quite clear in the Supreme Court's case in Google—is the market for the original work. And so the question that the librarian is answering and that the Court has to answer is whether because somebody is accessing this software in order to make repairs, the hospital is less likely to buy the MRI machine or the ventilator or whatever, maybe because they're getting what they, you know, would otherwise get from a different source. And that's just not—you know, it's not a competing product on the—the copies that are generated as part of the use, you know, doing the repair are not a competing product on the market. On the market for the original work. And I think— I'm a little confused with that. If the original work is the repair software that the OEMs created, and you're saying that other people can access and use it freely and do whatever they want, that's not an infringement? It may be—so the question of whether you can access it and whether it, you know, can lawfully be put behind digital locks is a question under 1201. So you could—it is not infringement to access a product that is subject to digital protection measures if there's an exemption to 1201. But all that Fair Use stuff comes in when we talk about other standards about whether they'll be infringed. It's an inhibiting and non-infringing use. Right. So I think the question is whether the copies that are made sort of incidental to the repair technicians running the program are infringing copies because it's a copyright—it has to be a copyright use whether those are infringing copies. And so what—and I think Google is a helpful comparator because—and I think—if I could just step back for a second. So software is obviously subject to copyright protection, but it is subject to copyright protection for its expressive qualities, not necessarily for its function. That's the Ninth Circuit's case in Sony, and also, you know, Google and other cases support that, agreeing in this court's jurisprudence. And so what you're looking at in Google is a situation in which somebody copied a chunk of software and put it in their own platform. And the Supreme Court said—and, of course, that software does exactly in the new platform that runs the same functions that it runs in the original platform. And the Supreme Court said that that was Fair Use. And so just the fact that the software sort of runs the same function as part of its use by the repair technician isn't—doesn't mean that the copies that are created are infringing the original copyright holder's copyright. How do you infringe the copyright of the software? I think this would be a much harder case if the repair technician was downloading the software and taking it with him to another—to the next—to fix the next MRI machine, or downloading the software and using it to make his own repair software that he's selling as an alternative to what's embedded in the machine. Or, you know, creating a second—you know, some sort of secondary market for the original software. But that's not at all what's happening. What's happening is the technician is accessing the software and using it for the sort of transformative purpose of fixing the machine. And then any copies that are produced incidental to that use are destroyed. There's no sort of retention of the software. There's no repurposing of it into something that is being sold as a—and this is from Campbell—a substitute for the original work. And I think that is what makes it a fair use. That the use—the copies that are created incidental to the access in order to repair the machine are not substitutes for the original copyrighted work. We're not suggesting that there isn't a downstream market for repair technicians, but that's not the market. Are you saying that unauthorized use of repair software is not a copyright violation? Yes. Because that's kind of what I'm hearing from the other side. Like, we made the software. We want to license it. You're not paying us for it, so you're infringing our copyright. And you're saying that's not a copyright infringement. Yes. You know, you might have a contractual disagreement about what exactly you purchased. Or you might have if they were, in fact, copying your software and making a competing product. You know, I think Google tells us that that is not necessarily a copyright infringement, but that is closer to the canonical case of copyright infringement. It is, I think, absent the exception under 1201, a violation of the DMCA to access and use the software because it's behind digital locks because you don't otherwise have, you know, the ability to use it. And that's why the librarian created this exception because it was a violation of the DMCA. The original equipment manufacturers were, you know, were litigating those cases in order to protect their rights and were bringing DMCA 1201 cases. And so I would also note, as far as I know, in none of those cases did the equipment, original equipment manufacturers include as a second, you know, complaint or a second claim on the complaint that also the use is violating our copyright. So they have never sort of litigated those questions as questions of copyright infringement. They, you know, because of the way 1201 works, they didn't necessarily need to for there to be an unlawful use. But I think it's telling that there have never, they have never brought those suits as also copyright infringement suits. And I would also note nothing in the exception precludes them from bringing the suits now to the extent they think that the librarian's fair use analysis was incorrect. The fair use analysis speaks to only the exception that is created for DMCA section 1201 liability. It does not, you know, preclude any, so if there were, and of course, you know, an Article III court would not be bound by the librarian's determination that this was likely a fair use in any subsequent suit. MARY JO GIOVACCHINI It is your intention in this exemption to cover repair software as well as operating system software? KATHRYN HURLEY I don't think that this has ever been understood in the administrative record or the litigation to date as two separate categories of software. There is a different pieces of the software might have different functions and serve different purposes, but I think it has always been understood, and I have a number of record citations I'm happy to point you to, although I understand there's been some back and forth already about highlighting some of those provisions. And I think, I think that... MARY JO GIOVACCHINI I would be interested in what... KATHRYN HURLEY Yes, so... MARY JO GIOVACCHINI ...makes clear that this is one suite of software, because when I was reading it, it looked to me like there was a lot of discussion about repair software, and further, they needed to access operating software. That seems to be two categories of software. KATHRYN HURLEY So I think even if you... I guess what I would say is sort of back up before I get to the record citations, and I'm happy to provide some, is that the exception, as Your Honor was reading, covers computer programs that are contained in and control the functioning of a lawfully acquired medical device or system, and that includes the functions that these various diagnostic tools are doing, right? It includes the fact that when the system malfunctions, it spits out an error code that says error 1201 or whatever the case may be, and you can...  KATHRYN HURLEY The software, like one of the functions, I guess what I'm saying is one of the functions of these machines is to be able to tell a repair technician what is wrong with the machine. That's a function of the machine. It's not just that it takes an MRI of your brain. MARY JO GIOVACCHINI That's my... KATHRYN HURLEY So I'm... MARY JO GIOVACCHINI ...I don't see how repair software controls the functioning. KATHRYN HURLEY I think the point I'm trying to make, Your sort of separate piece of the software package that is just repair software. That is a program that you can stick in that fixes the machine. If, you know, the way that this has been sort of litigated both in the administrative record and before this court is that there are a number of different components of the software that serve different purposes. There are error logs. There are event logs. There are related data files. There are things that have to do with the calibration of machines. And I'm... There are half a dozen declarations from technicians that talk about the kinds of things they need access to. And this sort of starting in the record on page 1055 and going through, you know, 1063, 1067, 1072, 1078, 1119. I'm happy to...  KATHRYN HURLEY Yeah. So I think 1119, which was discussed previously, is one of our best ones. And let's flip to it here. So it says, the types of software and data files that equipment manufacturers restrict or limit access to include service logs, comprehensive diagnostic tests, error codes to identify specific hardware failure, servers and IP addresses, remote diagnostics, Windows access, touch panel calibration, backup system settings with licensing and software updates for compatible hardware. So you're saying that's a mix of... Absolutely. I'm saying that those are things that control the functioning of the equipment and include related data files. And that... What's going on here? Maybe what functioning means? I mean, if the way things are designed to function now is not just to push the air in the lungs or take the MRI, but in fact, to alert medical officials when there might be a problem with the machine, just like cars, functioning systems now alert me when that low tire pressure... I don't mean to mix exemptions here, but low tire pressure, it's, you know, how do we define the functioning? And is that... Sorry. I think that's right. And the point I'm trying to make, I think, is that the function doesn't just include taking a picture of a brain or, you know, doing the sort of outpatient facing part of it. It also includes the functions of the machine itself. But how does that control the... That allow... Well, the software controls the function that, for example, spits out an error code. Right. It says control the functioning. Oh, I see. Right. So the control of the functioning... Of the machine, right. Right. So computer programs that control the functioning of a lawfully acquired medical device or system, right? So it doesn't have to control the function of the... Right. Like the computer program is controlling a function of the machine. One of the functions of the machine is to provide diagnostic information when something goes wrong. And, you know, instead of being an MRI machine that turns into a brick as soon as something, you know, blows a fuse in part of the machine, you know. So what is happening is the software is providing information and then... They're really expensive pieces. They are. And they continue functioning.  For clients to buy them. And the record demonstrates that what, you know, how this industry has evolved is by including more and more of these functions in the software that is sold as part of the machine. And that technicians are no longer able to repair the machines with the limited access that they had prior to the DMCA exception being granted. And that they needed access to things like error logs and event codes and things like that in order to be able to actually repair the machine. The software is not itself repairing the machine. And I think that that is an important point that, you know, the use isn't necessarily to repair the machine. It is to enable someone to know what's wrong with the machine and then be able to repair it. And so the question of whether something is transformative of the original work and whether it's a market substitute for the original work are answered by the fact that there's no software being sold separate from the machines by the repair technicians. They're not retaining copies of the software to put into new MRI machines or to, you know, create a... Even in, you know, cases like Sony and Sega and the Ninth Circuit, they're taking copies of software and using it to create a competing or interoperable product. And the court said that those are fair uses because interoperability, like understanding how something works for purposes of interoperability is a fair use. And I think staying here for purposes of repair is a fair use. And the plaintiff's trick is to sort of say, because it's for repair, because that is the function of the software, then therefore it cannot be a fair use. And I don't think that's quite how to understand the fair use analysis. I'd like to say something... Can you articulate why exactly? Yeah, I give you sort of... If you walk through the four steps of the fair use analysis, on the first factor, the question is whether the copies are being used for the same purpose. And you have... I think the right way to think about it is, you know, when the repair tech... When the software person who's coding the software sits down and writes the sort of expression of software and says what it's going to do, he or she is doing that in order to create a program that will be put into an MRI machine that will allow it to spit out a code that says, like, there's a blown fuse or whatever the case may be. The repair technician isn't writing code, isn't putting it into a machine that will be sold, isn't sort of selling it to somebody else who might use it in the same way. They're looking at the sort of operation of the software and saying, oh, there's a... It says in, you know, there's a blown fuse. Yeah, they're just accessing it in order to... For the content of what it is. And, you know, in the same way that, like... Not to make a new copy. Not to make a new copy. And so the use is different. And I think that also... And if I could sort of as a pin, the Supreme Court has said that factors one and four of the fair use test should be sort of considered relatedly because they inform one another. And I think it's very clear in factor four that there is no competing market for the original work. There is no competing market for this software that the repair technicians are... Even the independent servicing operation organizations, the hospital technicians who, you know, work at the hospital that purchased the software, they're not selling competing repair software to the extent you consider this repair software or even sort of operational software. They're selling a service. And the Supreme Court has said that we don't consider sort of downstream effects of licensing and things like that to be relevant to the question of whether something is a substitute for the original work. If we did, then I think a number of, you know, like... Then Google would come... Google versus Oracle would have come out quite differently. And so... And also, as the Supreme Court said in Google versus Oracle, I think, you know, like, if you write a really bad theater review, that is going to have an effect on the market for the original work because people won't go see the original work. But that's not the market that we think about, right? The market we think about is whether or not you have created a competing play and you are using the material from the original play in a way that is infringing. And then also on the second and third factors, the second factor in particular, this is software, it is, you know, functional in its use. And the court has made very clear that that weighs in favor of fair use in this context. And, of course, the third factor is how much of the software is used for... to be necessary for the purpose or how much of the copy is used or how much in copy of the original work is used. MARY JO GIOVACCHINI How would this analysis work if it's a PDF of a manual that's now loaded onto the machine? KATHRYN HURLEY Yeah. I think it would be the same, Your Honor, because it's not like the repair technician is taking the PDF manual with him or her to the next machine and they're not sort of making any copies that they're retaining or selling or using to service other machines. I don't know that the fact that it's software versus PDF makes a huge difference, but... MARY JO GIOVACCHINI It's a PDF of a manual that's for repair and people are using it to make repairs. To me, that seems less transformative than your original hypothetical, which was we've made software that spits out an error. And I don't... I'm just trying to understand, like, how that fits and if there are some infringing aspects of this, and if so, how does that affect the analysis? KATHRYN HURLEY I don't think so, because the question isn't whether when you read the PDF, that's copyright. That reading the PDF isn't copyright infringement. The question is whether if you generate some copies of the PDF as part of your reading it, whether the use of those copies is a substitute for the original work. And the technician is not retaining the copies of the PDF. It's not, you know, I think it would be different if the technician was, like, downloading the PDF and then taking it to the next repair appointment and consulting that PDF instead of accessing whatever is stored on the next machine. But the record makes clear that, one, that's not happening. And two, the software and the various parts that are here are not interoperable, and they're not sort of taken out of one and put into another. There's not really any support for the suggestion that there would be a market to do that because of the way these very complicated machines work. And so I don't think it... whether or not something is a piece of software or a PDF of, you know, a service manual makes a huge difference with respect to the fair use analysis in that respect. MARY JO GIOVACCHINI. People can read things all the time and apply that knowledge.  Yes, of course. And, you know, I think, you know, you might conclude that breaking into the PDF is 1201. It is a problem under 1201 if you don't have access because of digital locks. But it's not... reading it is not copyright infringement. And I'd like to touch very briefly on the Section 117 point and just make two quick points, if I could. The first is I don't think the court can read anything into the fact that the librarian chose to rely on fair use analysis rather than Section 117C because petitioners put forth both as possible basis to conclude that this was a non-infringing use. And what the librarian said was, I don't actually have to think about the 117C question because I've concluded it's a fair use. I don't think you can read anything into that about whether or not 117C would also render this a non-infringing use. And I also wanted to just note that the argument that Section 117 renders some... 117C renders some things per se non-infringing uses doesn't have any bearing on whether other uses that may or may not, you know, that may be outside the scope of 117C aren't subject to the full suite of copyright defenses, including fair use. And so there's no basis to conclude that, you know, because something isn't covered by 117C, it can't be a fair use of software or it can't be a fair use of copies generated as part of the use of software. That's an argument that the Ninth Circuit in its SEGA decision rejected as basically borderline frivolous, and I don't think there's any reason for the court to adopt any argument along those lines here. I just want to ask you something. I don't quite technologically understand. So when the repair person comes in and a copy is made, is that because the technician is choosing to make a copy or is it because it's spontaneous, you know, when you turn the thing on or get in there, that just spontaneously happens by design of the software? My understanding is it is the latter, and that no copies are being retained by the  They're all, you know, destroyed when the technician powers off the machine and goes off to store them.  That they're copied onto a USB and taken home with them, at which point we've got a whole different case. Yes, you're right. That's correct. So I will admit my technical knowledge of how this works is also not 100%, but that my understanding based on the record of how this works, that the machine itself creates the copies and destroys them or, you know, they are deleted when the servicing technician is finished with whatever he or she is doing. Do you have any questions? All right. Thank you very much. Thank you. Mr. Kimberly, we'll give you two minutes on rebuttal, if you'd like. Thank you very much, Bridget. If I may, I'd like to first address this question of the market. My friend on the other side suggested that this really is not, and the idea whether there's actual copyright infringement going on here. My friend on the other side suggested that there's not copyright infringement going on because using the software to provide services is not the same as copying it for a commercial purpose. But respectfully, that just, one, that's squarely contrary to what the Ninth Circuit held in triage systems. Second, it is just inconsistent with how copyright law works. If a singer copyrights sheet music and performs the song and immediately shreds the sheet music, the singer has still committed copyright infringement, performing the song without paying a license. That's the copy is the performance. It's the singing. Uttering the words. Well, but that's right. So the way- I mean, okay, I think the sheet music and the performance are actually two separate things. But that's a different issue. But I guess my point is, so too is the performance, if you will, of the instructions for how to repair the machine or the actual putting to use of the diagnostic software. You know, the idea- My friend has a book on refrigerator repair. And so I've got a problem with my refrigerator, and they go, this book's great. Read it. I read it. Gives me ideas about repairing my refrigerator. I use it to repair my refrigerator. Hand the book back. Don't make any copies of it. Just read the book that was loaned to me. I handed it back. Repair my refrigerator. I've engaged in copyright infringement. So I think analytically, this is the difference, Your Honor, between physical books and electronic books, because you haven't in the scenario that you've described, but copies are being made. If there is a PDF on the system, and you open the PDF to access the PDF- The copy isn't being made by the technician. Yes, it is. Absolutely, it is. So it's being made by your software anytime- your software is agnostic as to who is turning the machine on when a copy is made. Your Honor, I'm not talking about turning the machine on. I'm talking about the machine is on. You double click on a PDF that says user manual. You open the manual. A copy is made. Okay? And then you read the manual for its exact intended purpose, to provide a service, which you couldn't provide without the manual. That is copyright infringement. And again- What's the infringement? The infringement is the making of the copy to access the PDF. And on this court, I would point the court against- Is that the case? When they don't themselves make the copy? Well, so the- I mean, it's called the RAM copy doctrine, Your Honor. It was what 117C was adopted- The spontaneous.  Well, then- No, no, no, no, no, no, but- The machine itself creating it automatically. Well, but the idea is that when- the whole concept behind the RAM copy doctrine is when you turn on the computer, the person who activates the computer is the one making the copy. Right? So I'm not talking about copy of operating software when the machine is activated. I'm talking about- The argument about double-clicking on PDFs anywhere, the librarian- Oh, Your Honor, I would point the court to 1055 in the joint appendix. And this, again, is the declaration of Robert Wheeler, where paragraph 12, he says- Let me catch up to you.  So what he said, 1055? 1055. That's where he's talking about many- there's paragraph 12. Many servicing activities require access to and use of computer programs and electronic manuals. There's no question that we're talking about electronic manuals. That is part of what the exemption is seeking access to. That's what's protected by- that would be protected by the DMCA, but for the exemption, right? Correct. The same thing as saying that they've made an infringing copy. Is every violation of the DMCA- maybe this is my problem. Is every violation of the DMCA automatically copyright infringement? No. A violation of the DMCA- well, it's a violation of the DMCA. It's not- which is a part of the Copyright Act, so you might say it's a copyright violation. But it's not- Well, it's creating a whole level of protection for digital materials. Right. Since this has been exempted, which Congress authorized exemptions. And the violation, though, is the circumvention of the- No, it can't sort of- it can't be that the DMCA creates a protection that the librarian then cannot take away through an exemption because it's infringing under the DMCA. The whole point of the DMCA is that these things- getting past these keys and protections will be an infringement unless it's in the exempted category. And then to be in the exempted category, you look at traditional fair use for copyright. Analytically, Your Honor, respectfully, I just think that's wrong. The DMCA makes it an independent violation. It's not- I get that, but it can't- the whole- Congress makes it a violation only if the librarian hasn't exempted it. So it can't be that the librarian's exemption powers are tied by the fact that the DMCA has otherwise created something to be a violation. If there were no exemption for this, right, so imagine you persuaded the librarian, then of course them coming in would be a violation of the DMCA. Yes. Okay, but your argument seems to be because the DMCA protects it, it can't possibly be a fair use for purposes of the exemption authority. No. Is that- okay, I'm going to say that again. No, I'm- look, I'm- You're more expert in this than me, so I'm misunderstanding the category. Well, I mean, technically you could put non-copyright protected material behind a technological protective measure, and it would be a violation of the DMCA to get to even non-protected material, right? You still need the exemption. So the question whether it's protected by copyright and the question whether it's a violation of the DMCA are not necessarily linked. They're not one and the same. My point is only that if there's a PDF on the machine and it is accessed by a user, it is copied. That is copyright infringement, period, unless it is a fair use. And so the question is, is it a fair use? Is that true of all of the repair materials that if you use them, you're making a copy? Yes. All of the software too? Yes. I mean, that's the whole- It's on the record. Your Honor, I don't know if that is a fact in the record. I think it is known by people who practice in this area. I mean, it is the RAM copy doctrine. It dates to 1992. The MAI case, which was the basis for Section 117C, is the entire premise for the DMCA. So the RAM copy doctrine. And what's the case? MAI system. It's a 1992 case. And it's the idea that every time a file is pulled from the hard drive and copied onto the RAM of the system, you're making a copy. And that is an independent- At any time you access it, it goes to the RAM. At any time. So if you had a PDF on a hard drive and you double-click on it, it's going to move to the RAM. You've made a copy so that it can pop up on the screen. And that's true of software as well. That's true of software as well. Exactly. That's the whole premise of all of it. That's the whole reason Congress begged to differ and enacted 117C. Well, exactly. But it enacted 117C and it's been- of loading operating system software necessary to activate the machine for purposes of servicing and repairing the machine. And if that's all that we're at issue here, we wouldn't be here. The whole point is that the ISO sought more than that because that wasn't enough. I'm sorry. So is it your position then that making a copy is the infringement period regardless of the purpose of that copy? I'm sorry. One more time. Is it your position that making the copy is a copyright violation period regardless of the purpose of that copy? No. I mean, if it were for fair use. I mean, the purpose of the copy implicates the question whether it's fair use. Our point is this isn't fair use. So I guess then the analysis is if the copy is made just for purposes of repairing this one machine and then it's destroyed and not used for other- Exactly. Is that infringing or not? Yes, of course. Then why? Because it is the original intended purpose and the copy is being made for a commercial use. And not only is it a commercial use, it's a substitute of commercial use. If the ISO- It's intended by the technician. It's just the way your software works. I don't understand, Your Honor, how you could look at a PDF file, for example, or use a software program if it literally cannot be used without making a copy. I don't understand how it could be that the service technician didn't intend to make a  Why can't you just access the originals? This is my tech- I'm total technology Luddite here. But if the software is on the system- Well, I think this comes down to the question, and maybe this has just been a fundamental misunderstanding all along. To access is to make a copy. That is the way that it works when you're talking about electronic materials like this. And that's what the DMCA is all about. It's why Congress recognized that really what this comes down to is accessing the material when you're talking about electronic material. Because to access is to copy- I guess my point is that if you think of traditional, pre-digital copyright, people have choices to make copies or not. And then the way our technology has advanced is people don't have those choices. Repair people don't have this choice. And to be clear, if they're intending to make a copy and do and put it on a USB or something like that and take it home with them, right, then they definitely would be intending to make a copy for their own purposes. They would be, Your Honor, but I would tell you- If they're not destroying it at the end, is this required by this exemption? Congress was aware of exactly this issue and it enacted Section 117C to address it. Our point about 117C is only that the librarian can't use the exemption process to effectively amend 11C to grant essentially a copyright exemption to substantially more than what Congress understood it otherwise applied to. And that's exactly what's going on here. And the district court, oddly enough, justified its opinion in precisely these terms, explaining why the librarian was right to use an executive rulemaking process effectively to amend a statute. That is not the way it's supposed to work. Do you have more questions? I guess so, yes. Just to wrap up, it just seems to me that we're back to a basket of computer programs. Some of which might be infringing, some of which are not. And by the plain words, it seems that if it adversely affects ability to make non-infringing use. And if it-that means if even a subset of that is affected and it's non-infringing, that this is okay, right? Because if you read that provision, it seems that the prohibition shall not apply to persons who are users in a particular class of works if such persons are or are likely to be in the succeeding 3-year period adversely affected by virtue of the prohibition and their ability to make non-infringing use. So applying that here, if there's a basket of computer programs, some of which would be infringing, some of which would not. The ones that are not, they're making non-infringing uses and they would be affected by the prohibition. So if it's a mix, then the librarian wins under this. I don't-I don't understand how that could be the outcome, Your Honor. I'm just reading the provision. No, I get it. But the-I mean, if the librarian used the 1201 process, the 1201A process to adopt an exemption that authorizes the circumvention of technological protective measures to copy works for infringing uses... Some infringing and some not. Some infringing and some not. To suggest that then a, you know, the exemption has to stand if there are any non-infringing uses within a broadly described category would be a really perverse incentive to the librarian and to proponents to seek really broad categories in hopes of sweeping in obviously infringing uses and... But wouldn't-wouldn't you have to litigate differently at that stage and be like, this category is too broad? The particular class of works can't be defined? Well, Your Honor, I think there are two things to say about that. First, we have been crystal clear from the beginning that our concern is the diagnostic and service software and maintenance-related materials. We haven't argued about the other materials and whether or not it would be infringing or not, so... When the secretary adopted a class of works that included the operating clinical and the diagnostic... Right. ...then shouldn't you at that point have said, this is not one class of works. It's a different analysis, depending on if it's... Well... ...clinical versus... But what would the upshot be? The upshot would be then that... I think you'd be on much stronger footing because the fair use analysis is stronger for you if you define the class of works as the diagnostic... And I guess my point is we have always defined the class of works that way. So I think really what this comes down to is, like, would it be on the table for the district courts to enter to, like, sever the two parts, the different categories covered by this exemption and, like, issue a partial vacatur as applied to the materials over which we've been litigating all along? And it's an equitable remedy. Of course, the district court could do that. But you didn't ask for that. But we didn't ask for that, Your Honor. But, you know, this is an action in equity. We have been crystal clear that that is what we're talking about. Like, having the bottom line... I know you were clear, but once... I mean, I'm just struggling with this as the reviewing court. Yeah. And it seems that you might have had a path here. But the way I'm looking at the record and the provisions and everything now and after the argument, it just seems that if you wanted to argue it this way, you needed, as Judge Millett was going through at the beginning of this argument, make it more clear that you're only focusing on this, which you did. But then when the librarian came out with all of this analysis that assumed it was operating in clinical, it seems that you would have had to, at that point, try to pull this apart and be... We would have made the exact same arguments. And the arguments would have been, all we're concerned about is the diagnostic software, the service software, and the maintenance-related documents. But the exemption covers more than that. No, no. I get it. So we would have made the exact same argument, and we would have said, we're not arguing about what the librarian is focused on here in this litigation. If the librarian is concerned about that, that's not what we're concerned about. Limit the order vacating the exemption to the materials over which we, the plaintiffs who have control over the case, are complaining. So the only thing that would have changed is, like, we add three additional words to the conclusion, which would have been, like, as applied to the complained of materials. But again, this is an action in equity. I mean, in request for a... I understand, but the thing that is troubling was not specifically objected to. Because I see what you're saying, that you could smuggle in. Like, say the thing that you've always cared about is this, the repair stuff. And the ISOs say, we don't have a good fair use argument in ISOs, but we have a really good one on operating clinical. So let's, which is kind of what they did. Let's ask for an exemption that seems to focus on operating clinical. It seemed that way to me. But actually will cover the stuff, like the repair stuff. And, you know, it could be a strategy. But it seems to me that it would be incumbent upon you to, at that point... In the rulemaking. In the rulemaking, the class of works here has to pull apart these two things. They cannot be together. And that would prevent the problem that you're positing, which is you can have an overbought category that sweeps in things that are infringing with non-infringing. I'd like it to be made on whether that's tenable or not, whether it makes sense, whether it's in fact, practically, we don't know these things. There's just no record on this. You got another? On whether it's tenable that the exemption could have been written to exclude the software. It's practicable all to say that they really only want to see these five things and don't need to see the clinical operational things. Or we're fine with them seeing the clinical operation things. We just don't want them to see our PDF manuals. That type of thing. I don't know if that's even tenable as a repair plan. And we need a fair use analysis based only on repair stuff, because it's a totally different analysis. Unless they decide it's not tenable. Yeah, but it's okay. It's a briefing, but not on the record. Just one final observation, and I appreciate the court's patience. One final observation on this, and that's that, again, the burden is on the proponents. So, looking again at 1055, where Robert Wheeler says, I need computer programs and electronic manuals. I need, sorry, where is it? I've missed the quote now. He's talking about these particular kinds of software and manuals, explaining that it's necessary for him to do the work that his company does. And that that's why he wants the exemption. If the exemption, if he failed to provide the information necessary to support the grant of the exemption, then it was arbitrary and capricious for the library to grant it as to those materials. And those materials were the ones as to which my clients objected in the rulemaking. I think they were very clear about the existence of this separate market and how it would do harm to that market. I appreciate that. You may not have been persuaded by those citations that I gave you. I'm learning through this argument. So, I appreciate all the things you pointed us to. And also, I think this gives you a roadmap for when they want to renew this, like what the concerns might be and how you might litigate that. Judge Childs, do you have any questions? No, thank you. Do you have any more questions? Thank you very much for your time. Thanks to both counsel. The case is submitted.
judges: Millett; Childs; Pan